vs. Kayla Howell, No. 515-0004. Are both counsel ready? You may proceed. May it please the Court, Counsel, Assistant Appellate Defender Im Sun Nam on behalf of Kayla Howell. On appeal, Kayla originally raised four issues in her briefs. After briefing, this Court requested additional briefing as to whether this Court can address the merits of her argument on appeal. I want to begin with the particular circumstances of Kayla's case because they're so important to the issues on appeal and to the supplemental issue. Afterwards, I'll briefly address the matter that this Court was concerned about in the supplemental brief and then address the first as-applied constitutional challenge raised and stand in the briefs for the remaining arguments unless this Court has questions at that time. Twenty-two-year-old Kayla was charged with aggravated criminal sexual abuse for performing oral sex on 14-year-old J.L. There is no allegation that this was a forcible felony. Rather, Kayla was more than five years older than J.L. Further, the record indicates that J.L. persistently sought out sexual acts despite being rebuffed and revoked repeatedly by Kayla. And notably, this was a one-time incident and she was the one that stopped the act. But to get the full picture of Kayla's circumstances, Dr. Cuneo's report is very important here. It plays a big role. Very early in her case, defense counsel asked the Court for a fitness evaluation because he had a bona fide doubt as to Kayla's intellectual capabilities to understand the nature of the charges against her and the criminal proceedings. Without much hesitation, Dr. Cuneo was appointed and she was evaluated. He reported that Kayla not only had physical disabilities but intellectual disabilities as well, stemming from medical issues since infancy. She was born three months premature, had fluid in her brain, so she had to put a shunt in there. She suffered from a stroke at a month old. I think defense counsel says three years at one point, but the report says a month old. And this affected her right side completely, so especially her right hand. Dr. Cuneo was able to know that the right hand was contorted. She had limited use of it. Her right leg was, she had weakness in her right leg, and her speech was somewhat impaired. She had surgeries throughout her childhood because of her right side. She had been in SSI as a result of her intellectual and physical disabilities for an entire life. Dr. Cuneo found that Kayla's affect at age 22 was simple and childlike. She functioned at the lower end of the normal range of intelligence. Her IQ was only 82. And while she graduated from high school, she was in special education programs throughout. And he found that her thinking was concrete, simple, and this was consistent with her history of brain damage and her special education. Still, he found that she was oriented in all three spheres, so she could tell person, time, and place. She could give a simple history of events, but she admitted that she got confused easily when she was faced with something new. She was diagnosed with adjustment disorder, with anxious new dementia due to a stroke, and borderline intellectual ability. And while her diagnosis didn't impair her ability to go to trial, maybe understand the nature of the proceedings against her, she needed special provisions, and that was Dr. Cuneo's findings. Notably, the report says that she could eventually understand and grasp new concepts after initially not knowing. So, for example here, she initially knew nothing about the court system because she's never been in trouble with the law before, but after explanation and going through this with Dr. Cuneo, she was able to eventually grasp what the court personnel, what their roles were. But even this was limited, so she could tell that the state's attorney was against her, that the public defender would help her, that the judge would make a decision, but it was still a very basic understanding of the concepts. So ultimately, she's found fit for trial with special provisions, and that's because she's quick to say that she understands the concept when she does not. So these special provisions were put in place so that the court or the attorneys would ask her non-yes-or-no questions, that they would use simple vocabulary, simple sentence structure, and make sure that there are periodic checks, so to check with her to make sure she was understanding what was going on around her. And this was needed to demonstrate her competence, so that she was truly aware of what was going on around her and what was happening to her. And so this was Kayla at the time of the incident. At age 22, she was living with her boyfriend and her best friend, along with J.L. J.L. lived on the property. He was in a camper in the backyard, it seems. So he knew Kayla. He knew that not only did she have these physical disabilities that were apparent, she also had these intellectual disabilities, and he could tell by speaking to her that her speech was impaired and that her affect was childlike. So Kayla was found fit with special provisions, pleads guilty to aggravated criminal sexual abuse. In exchange, she gets 24 months of probation, and the parties are very detailed as to what the terms of the negotiation are. She gets STD and HIV testing, she undergoes DNA sampling, and she completes anger management. And that's in exchange for dismissing the two misdemeanor charges that are also against her. And while these terms are laid out, both parties are fully aware that the only matter of contention is whether she should be granted a variance from a lifetime with SORA. Now that she admitted guilt to the criminal sexual abuse, she's labeled as a sexual predator. This means that she's on SORA for the remainder of her life, and she was 22 at this time. Procedurally, plea counsel and the state kind of discuss the SORA matter before she enters her guilty plea. But the court, in the midst of this discussion, stops the parties, asks them, Are all the other terms of the negotiation agreed upon? And the parties say yes. Absolutely everything is agreed upon except for SORA. Do you dispute that the SORA, in this case, is a collateral matter? Did the court or did... Do you dispute, is the defendant disputing that the SORA is a collateral issue? Yes, Your Honor. Fully negotiated plea. Yes, Your Honor. So I think even below, at the trial court level, defense counsel said that her sentence was excessive referring to or alluding to SORA. So SORA, in Kayla's position, has always been a punishment, a penalty, and it kind of flows right from this case. So that's another issue I assume we'll get to later. Yes, Your Honor. I'm asking if this is a fully negotiated plea. It's fully negotiated in the terms of everything was negotiated to except for SORA. So I don't know, there's another, I don't think there's another way to say this. Because the parties, everyone knew going into this that SORA was going to be debated. That was the matter of contention. So Kayla does say that this is a fully negotiated, or this is a negotiated plea. And to the terms, it's, to the terms of the agreement, SORA, well, we're disputing that SORA is collateral. So I don't know if that answers your question. Okay, explain what you mean when you say you're disputing that SORA is collateral. Right. We're saying that SORA is actually punishment. So we're going back to, so we say that this is negotiated. This is a negotiated plea. Every, all the terms are negotiated to. The basic understanding is that SORA is collateral. But we're now arguing that SORA has become so punitive. It has become so much like a penalty that it is now a penalty. I don't think they argued it in this particular wording below. But that's the argument that we have here today. So as discussed, the parties agreed to everything except SORA. And then the court allowed Kayla to plead guilty. And then he had them argue the SORA matter. After argument, the court, and this is important here. After the argument, the court says it doesn't have discretion, or it felt like it didn't have discretion to grant her a variance. Even though it recognized that Kayla's circumstances were unique, that in her unique circumstances, a lifetime of SORA could be particularly onerous. Then the court indicated that while it wasn't prompting her or counsel to do so, that an appeal would be the way to do this. That this court here is the way to address this, make new law, address whether a lifetime of SORA in Kayla's circumstances, that she could be granted a variance in her circumstances. The court did recognize that this was a novel issue, but did indicate numerous times that the appellate court was the way to go. And as the supplemental briefs will discuss, she does file a motion to withdraw below, and a motion to reconsider. But notably, if this court reviews the entire record, her arguments have always been tailored towards her specific circumstances. And SORA has always been that issue. How she applies to SORA, but how SORA applies to her. And counsel, she has not persisted in that motion to withdraw.  Is that correct? No, Your Honor. And that's kind of the posture that we're at. So plea counsel does indicate in the motion to withdraw below that the court should have discretion, does have discretion, because Kayla fell into this unique category, that she was warranted a variance from this mandatory SORA requirement. And that the sentence imposed was excessive, in violation of the federal and state constitutions. And she appealed. Do you agree that there's nothing in the statute that gives the trial judge that discretion? Well, Your Honor, the statute, as far as I can recall, there's nothing in the statute per se. But we have the case from the 3rd District, People v. Tedder, that recently found that this amounts to punishment. And in that case, the appellate court did grant Tedder a variance, or he was exempt from SORA. So the trial court here, we're arguing that the trial court did have discretion. The trial court was given all the information it needed. It was told that Kayla was a special case, that she, while she can ultimately understand, she can follow the rules, that she needed special provisions. And SORA is hard for even a fully functioning individual to follow up by all the changes that are happening. And as this court knows, any violation of SORA can be a prison sentence. And the more violations, the higher felonies, and so on and so forth. So this is an ultimate prison sentence for Kayla. And as this court knows, the record shows that any mention of jail time, she gets emotional. So she knows that she doesn't want to go back to jail. And Tedder, as I recall, was decided in January, is that correct? Yes. And there's a petition still pending. That's right, Your Honor. So there's also another case, People v. Bingham from the 1st District, that I inadvertently forgot to put that in the briefs, but appeal was granted in that. And I believe they just heard arguments on that case. So People v. Bingham is in the reply brief, I believe, page 12. Ms. Bingham did not follow Tedder, is that correct? That's correct. But the PLA there was granted. And I believe if the Supreme Court will address it, it should go towards this whether SORA amounts to a penalty or not. So turning now to the matter of this court's request for additional briefing as to whether we can address the merits of Kayla's argument on appeal, which entered the negotiated guilty plea but doesn't persist in it here. I think effectively the parties agree that this court can address this, address the arguments on appeal, and that's the short answer, unless this court wants to go into the briefs a little bit further. I think this court asked where Kayla's appeal stood in light of People v. Evans, People v. Absher and Haley. In those cases, the main difference, I think, is that the defendants there are unilaterally trying to change the terms of the negotiated plea. There's a form of gamesmanship there. It's not fair to the State. But here, as I emphasized, the State and Kayla were fully aware that this was not a negotiated matter. This was going to be fully contended. And whether this court grants her invariance from SORA or not, that doesn't affect the actual terms of the negotiations. And I think that's why the trial court pushed that off after the guilty plea was taken. Does this court have any questions regarding the supplemental briefing? No. Okay. So I want to then jump into the actual arguments on appeal, mainly the first as applied constitutional challenge. But for us to get into the first constitutional challenge, this court has to find that the SORA statutory scheme today amounts to a punishment, a penalty. That's the first step into getting into her issue of whether SORA, as applied to her circumstances, violates the Eighth Amendment Prohibition of Cruel and Unusual Penalties and the Illinois Proportionate Penalties Clause. And Kayla asked that this court at this time find that SORA is punitive. I know that this court addressed people being pollard before, but this court addressed that case kind of in light of people being Avila Briones. So they didn't really get into this idea, or they didn't get into this discussion of whether SORA now amounts to a penalty. And as we discussed, Tedder from the Third District does not consider SORA a penalty. It's punitive. And I want to bring this court's attention to Kayla's opening briefs, pages 19 through 24. So I don't want to belabor on this argument. There have been cases that found that this is punitive. There's others that still maintain that this is not. It seems like the issue might be before the Supreme Court. So I just want to emphasize here that if this court looks to the appendix, there's two charts. So one chart is from the initiation of SORA, I think in the 80s, 1980-something. And the first Supreme Court case, people, the Adams, I kind of go through and show how SORA has developed. So this is kind of a visual way to see what boxes are checked off, what boxes have changed, and see what the amendments have been since we got SORA in Illinois. The second chart is about SORA or comparing SORA to probation and parole. So I think those two charts, although not exhaustive, are indicative of or it demonstrates that SORA has now more and more requirements, more and more ways to violate it. It has now become a penalty or a punishment. I also want to point out that Kayla is brandished. She has that title of a sexual predator that's going to be with her for the rest of her life. And as this court knows, in the opening brief, there's a short introduction how individuals with physical or intellectual disabilities, they have, they get subtle forms of discrimination. They have subtle forms of kind of being shunned from society. So on top of what she already experiences from her community, from society, she is now a sexual predator. And the criminal system also has her falling in through the cracks. So because she's not a juvenile, there's no way to really review her case over and over again. She doesn't get a review of this as a matter of right. She's treated as an adult, a fully functioning adult. She's not treated as a juvenile. But she does have her childlike affect. She does have her IQ of 82. So this is one of those cases where we continue to emphasize that she is unique. And she falls into this crack that this court should at least acknowledge and show that she isn't just like any, or she just isn't like the common recidivist or the habitual sex offenders or the child molesters. Another factor that I do want to talk about is the SORA promoting the traditional aims of punishment. So we have retribution and deterrence. And as we discussed in the briefs, SORA, once you're on it, unless you're on that 10-year term, you don't come off of it. So I think in the briefs the last time I checked, there was 30,000 people on the registry in Illinois County. And juveniles aren't on that list, that public list. So it's only going to increase. And here Kayla is swept into this 30,000-plus registrants. And there's no way to really consider her circumstances. There's no way to mitigate what her background should be able to do in the criminal justice system. And that's our history. Normally we treat those with intellectual disabilities not that they're not culpable at all, but that they're less culpable, less morally culpable. And the system as in place right now doesn't account for that for Kayla. So that was just a brief overview of the seven factors, but we believe that SORA is now punitive. Thank you, Counsel. Good morning, Your Honor. May it please the Court? Counsel? My name is Patrick Daly. I'm here on behalf of the State. I want to actually start with this Court's request for supplemental briefing and get into that. First, it raises I think an interesting question and one which in my research I was not able to find a definitive answer. And that is the applicability of the Evans-Linder Rule to what I would consider to be a collateral consequence of the guilty plea in this case. Courts have held that registration under the Sex Offender Registration Act, SORA, constitutes a collateral consequence. Collateral consequences are typically defined as something that is imposed automatically without discretion for the trial court to impose or not impose. Clearly, the Sex Offender Registration Act is imposed automatically upon the defendant's conviction for a qualifying offense, which is the case here. So it does constitute a collateral consequence of the plea. I think that that characterization sort of informs the State's approach to this, bar any other authority out there that kind of directly guides it. The defendant and the State sort of chart different paths to the same result. And I bring it up largely because I perceive the defendant's argument to be essentially that, well, the Sex Offender Registration Act, because of its constitutional infirmities, in fact, does constitute punishment in as such as a sentence and as such from that, the court somehow has discretion ultimately to impose or withhold that provision as part of the defendant's sentence. I think the problem with that approach and the reason why I didn't really kind of take that on or adopt that in any way is because I think that, number one, obviously it recasts SORA as a direct consequence of the plea as far as the sentence is concerned rather than a collateral consequence. But also, two, I don't think that it solves the Linder-Evans issue, because if that's true, then Evans and Linder would apply in that situation, because here we do have, as this Court's authority has demonstrated through earlier cases like Richard, the procedural pathway, if you will, to challenging a fully negotiated guilty plea in this case. Consistent with our position that this is a collateral consequence then, it then sort of requires, I think, approving the bases, if you will, of Evans-Linder. Those cases, this Court is abundantly aware, are premised on this contract theory, if you will, that the defendant has with the state to enter into a guilty plea in exchange for considerations on behalf of the state. And what Evans-Linder has essentially said is the defendant's not going to be allowed to unilaterally modify that to which he's agreed to in a fully negotiated plea to his own benefit, because this is the agreement that the defendant had entered into. And I think integral to that discussion is the idea of, number one, the contractual relationship, but two, that that contractual relationship that's entered into, that contract has as its end result, its termination, a sentence. And therefore, I think that Evans-Linder directs itself to sentences and the desire to allow or to disallow defendants from engaging in what I think is called gamemanship of getting the benefit of a bargain of a plea and then turning around and remitting on it by trying to challenge that sentence later on. So it's our position that we believe this Court could reach these issues largely on the fact that I don't think that Evans-Linder applies under these particular circumstances because Evans-Linder and its progeny direct themselves towards sentences and not collateral consequences. Evans-Linder is not jurisdictional. It only relates to this Court's willingness or ability to reach an issue under these particular set of circumstances. It doesn't bother the defendant from pursuing an appeal. Jurisdiction is obviously attached as a result of the defendant's appeal from the denial of the motion to withdraw a guilty plea. And defendants can raise constitutional challenges even for the first time in an appeal without violating, I think, our position. Without violating Evans-Linder. So I just sort of fully articulate the State's position in this regard. This Court disagrees and finds it can't reach it. I'm not going to lose any sleep over it. But it's an honest assessment, I believe, at least about this interplay of this case and Evans-Linder. And hopefully this Court can get into a discussion of that for further situations where this may arise in future cases. One of the issues here, and it turns out, if you will, to the constitutional challenges raised by the defendant. This Court knows, of course, the defendant has the burden to establish the lack of constitutionality of the statute. Statutes are going to be construed by this Court under the presumption of constitutionality and in such a way as to preserve the constitutionality of the statute. On a constitutional basis. Justice Moore mentioned about tether. Tether, I believe, as of last I checked, last at the end of June, is still pending rehearing. I checked yesterday. I didn't see anything different to say otherwise. The impact of that is it's not even binding authority yet as to tether, much less, which as any other lower court, doesn't mean it doesn't exist. But it's sort of in that kind of a rehearing void at this point. Tether has been discussed by a couple of decisions subsequent to tether, which are not cited by the parties I won't get into here necessarily. But I do acknowledge its existence and I think I'm ethically bound to agree with their end of the Court that's found. Counsel has gone to great lengths to try to prove her case going so far as to quote Confucius. And Plato. Yes. I don't know if I have the capacity to quite get that philosophical about it. I think that those references are largely, I think, due respect to, I think we could all agree, considerations that relate to individuals with cognitive and intellectual deficits and the penological implications that arise from the same. The problem here is that I think when we're talking about constitutional challenges, they take one or two discrete forms. One is a constitutional challenge that's premised on a facial constitutional invalidation and another is based upon an as-applied. Defendant's argument, notwithstanding where I think the accurate and extensive chronology of the background of this defendant, the argument doesn't really track either very neatly. In fact, it's our position as a state that the defendant's argument is more a facial challenge than an as-applied. Number one, of course, it was not raised as an as-applied challenge below. And of course, the review are entitled to have a fully formed factual basis to make an application of an as-applied to the context of the defendant's argument. Now, the state has not raised a waiver argument here, and we did so intentionally and not inadvertently. I say that only because I think that there is at least enough of a factual basis developed for the defendant to come forward and argue the defendant's circumstances, if you will. But I think that nonetheless, while this court determines whether it's waived or not waived, it can still nonetheless find that the record is inadequate. Why? Well, what we have here is a situation where there's clearly a defendant who has issues, but these issues are not really discussed in terms of how they would affect her ability to comply with the Sex Offender Registration Act. It would require this court to essentially act as experts on appeal, if you will, to derive that ultimate conclusion that her specific particular circumstances would impair her ability to comply with the Sex Offender Registration Act. And certainly, they weren't enough to impair her ability to enter into a guilty plea, notwithstanding the fact that there were special circumstances here that Dr. Kameya went into in detail in this case. But I think that also in reference to what I'm saying here is when we go into the defendant's argument, the defendant speaks in very broad strokes about the application of the Sex Offender Registration Act to individuals with intellectual deficits. And that's where we sort of veer into this middle ground here, because now we're not really talking about this particular defendant. We're talking about individuals with cognitive deficits. But as-applied challenges are not class-based challenges. They're individual as-applied to this particular person, and that's not what's being done here. And when we look at the defendant's argument, a lot of the applications that the defendant applies towards establishing lack of constitutionality would be, for instance, she would have a difficult time securing long-term living arrangements. This is a factual condition that's applicable to anybody that's subject to the Sex Offender Registration Act, because the Sex Offender Registration Act has multiple provisions in places that you're not allowed to live near. The restriction from where children gather, that the defendant is barred from engaging in occupations or provide services to children, these are some of the things that the defendant cites. These, again, are all conditions not necessarily applicable to her particular circumstances, other than purely speculative, but broadly construed among almost anyone that's going to be subjected to the SORA. So we thought for, in this case, sort of a long-winded leap up here, is that the leap is that we believe the defendant's argument is more accurately, notwithstanding its characterization by the defendant, as an as-applied challenge, really a facial challenge. It bears all the hallmarks and standards of that. Once this Court rules in on that characterization, then it becomes a situation of assessing where we are as far as the state of the law is concerned with regards to both the Eighth Amendment challenges to the Sex Offender Registration Act and to the Substantive and Procedural Due Process challenge. Powell, under this Court, discussed the Procedural and Substantive Due Process, actually discussed them all, and I think that that analysis really drives our analysis here, again, to reiterate a lot of those positions with regards to the rational basis test being applicable for the due process argument in that there is indeed a rational basis both for the state to recognize the need for a Sex Offender Registration Act and implement that for the purposes of public safety. With regards to the constitutional challenge on the basis of the Eighth Amendment, other than Tedder, Tedder, a two-to-one decision, is really the only case out there that's actually arrived at this conclusion of its lack of constitutionality and its unconstitutionality. If Tedder holds up under rehearing, the Supreme Court will undoubtedly take it, and if that's the case, then we'll get a definitive answer if we don't get it from a different case first. Our arguments here, I think, pair a lot of the other courts' arguments with regards to the application of the Mendoza-Martinez factors to the threshold question of whether what happened here constitutes punishment, because you don't get to the cruel and unusual aspect of it, whether this is a disproportionate penalty until you actually determine whether it's a penalty or not. I'm not going to belabor that argument and get into all of those factors. They're laid out, I think, in the state's brief, and I believe that when this Court reviews those and looks at those in light of the case law that's out there right now, that the sum analyses in the application of these factors provides a result that the statute in this case does not punitive. In the suspended consistent position of the United States Supreme Court as well, as well as the United States Supreme Court in cases such as Smith versus Doe, that that would have to be the result here for this Court in upholding the constitutionality of the sentence if it chooses to address these issues outside of the evidence-lender issue that this Court also raised in the supplemental briefing. So, in that regard, I now stand on my brief for all other issues as related to this case, unless this Court has any specific questions. Thank you. Thank you, Your Honor. I just want to address two points. Our position, we're in a little bit of a disagreement. So, below, as I stated, defense counsel never used the word as applied, but the way that the record shows, everything is as applied to Kayla. So, it's her report, it's Dr. Cunha's report of her. The whole argument regarding SORA is specific to her circumstances. So, I know the words weren't used, but we're raising as applied challenges on appeal. And that's the second point here, is that the state's argument is that a lot of the points made in the briefs are facial challenges. But the state is taking the same position as our criminal justice system, as the legislature. It's not using the lens that Kayla wants or needs this Court to use, the lens that she does have this intellectual disability. She does have the physical developmental disabilities. That the specific circumstances here is between a 22-year-old with a childlike affect and a 14-year-old who knew of this. So, I think the position is that the record is adequate. The trial court noticed Kayla's circumstances. The trial court gave Kayla breaks when she needed it, when defense counsel asked for it. The record is full of this, where defense counsel informs the court through pleadings or during arguments about Kayla's specific situations. So, yes, all registrants will suffer, or all registrants will have a hard time finding a place to live. But Kayla, with her physical and developmental disabilities, and the fact that, historically, courts have recognized that those of these positions are limited, even without being labeled a sexual predator in the community, discriminated against, having those issues. So, that's on top of SORA. So, Kayla asks that this Court use the lens, use her circumstances when viewing these issues on appeal, as applied constitutional challenges. Unless there's any other questions? What are you exactly asking for? What do you want us to do? So, like Tedder, Kayla's asking that this Court grant her a variance, whether it's not the full lifetime, whether it's the 10 years, or whether she's exempted from it, like the defendant in Tedder. Thank you. Thank you, Your Honors. Thank you, counsel, for your arguments. The Court will take this matter under advisement and render a decision in due course.